UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL NO. 1:06cv217 |
| | ) |
| RAYMOND PARKER, et al. | ) |
| | ) |
| Defendant. | ) |

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by Allstate Insurance Company ("Allstate") on August 1, 2007. On September 4, 2007, several of the defendants[1] filed responses to Allstate's motion. Allstate filed its reply on September 18, 2007.

Also before the court is a motion for summary judgment filed on October 10, 2007, defendant Raymond Parker ("Parker"). Allstate responded to the motion on October 31, 2007, to which Parker replied on December 10, 1007.

Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his

---

[1] The responding defendants are Marion T, LLC, Travelers Property and Casualty Company of America (misdenominated in the Complaint as The St. Paul Travelers Companies), and Raymond Parker. The other defendants, MKT, Inc, Estate of Marvin K. Tinsley, Shawn Price and Jerry Foustnight have failed to answer or otherwise defend the complaint. Thus an amended default judgment was entered against these defendants on February 22, 2008, upon Allstate's motion.

opponent's claim. Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." Id. In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

      Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. Goka v. Bobbitt, 862 F.2d 646, 649 (7th

Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated. See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511. Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. Id. The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities

3

Corp., 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  Id.  A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252.  Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate.  Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

Discussion

This case arises out of an electrical fire that occurred on October 4, 2005 at the old Thomson plant in Marion, Indiana. The electrical fire caused the death of Marvin K. Tinsley and injured Parker, Shawn Price, and Jerry Foustnight.

On the date of the fire, Allstate insured Parker under an Allstate Deluxe Plus Homeowners Policy ("Homeowners Policy"). (Am. Cmplt. ¶22). The Homeowners Policy provides "Family Liability Protection" and the insuring paragraph contains the following: ***Losses We Cover Under Coverage X:***

> ***Subject to the terms, conditions and limitations of this policy, Allstate** will pay damages which an **insured person** becomes legally obligated to pay because of **bodily injury** or **property damage** arising from an **occurrence** to which this policy applies, and covered by this part of the policy.*

Under this coverage, however, Allstate "[does] not cover **bodily injury** or **property damage** arising out of the past or present **business** activities of an **insured person…**" (Am. Cmplt., Ex. A., p. 30; Ans. Def. Parker to Am. Cmplt., ¶25). The Homeowners Policy defines Business as

4

follows:

> *Any full or part-time activity of any kind* engaged in for *economic gain* including the use of any part of any premises for such purposes. The providing of home day care services to other than an insured person or relative of an insured person for economic gain is also a business. However, the mutual exchange of home day care services is not considered a business.

Parker worked for Thomson from January 1966 until June 15, 2004.  After the Thomson plant closed, Parker continued to work for Thomson as a maintenance man through a temporary employee agency, Wimmer Temporaries.

This employment lasted from June 16, 2004 until March 31, 2005.  Matt Queen supervised Parker at Thomson. After Parker's final day for Thomson via Wimmer, Queen contacted Parker to assist Queen on two separate projects during the summer of 2005.  The first time, which was after July 4, 2005, Parker showed Queen where the main circuit breaker panel board was located so Queen could turn lights back on. The second time, around September 1, 2005, Queen had Parker install a temporary power cable to operate a garage door.

Queen paid Parker for both projects, approximately thirty dollars for the circuit breaker project and sixty dollars for the garage door project. Parker never went to the Thomson facility during the summer or early fall in 2005 except for these two projects for Queen.  Therefore, Parker never went to the Thomson facility without being paid during the summer and early fall of 2005.

In early October, Queen contacted Parker because "MKT wanted to interview [Parker]." . According to Parker, Queen gave MKT Parker's name so that Parker could "work for them" "in the near future." Approximately the next day, Parker went to the old Thomson facility and met with Marvin Tinsley and Shawn Price of MKT.  Parker met with Tinsley and Price in the MKT

5

office within the Thomson factory for approximately one hour. MKT was salvaging materials from the factory and asked Parker questions surrounding his knowledge of the factory during this meeting. Even though Parker never signed any paperwork, he negotiated wages with MKT and discussed that he would be paid for eight hours a day even if he only worked for two. In his deposition, Mr. Parker described this meeting as an "interview." (Dep. Parker, p. 34, ll. 10-13; p. 55, ll. 22-24).

At the time of the interview, Parker received unemployment benefits, and he needed paperwork from MKT regarding payment terms due to these benefits. The unemployment office, Workforce One, had Parker volunteer wherever he could to show his skills whether or not he was paid. Parker "[hoped] to get a job through" "voluntary things." (Dep. Parker, p. 36, ll. 8-9).

On October 3, 2005, Shawn Price contacted Parker and first stated "I realize we don't have any paperwork, or anything yet, ready, or anything." (Dep. Parker, p. 44, ll. 16-18). Price then asked Parker to come into the factory and map out panels and circuit breakers the next day. (Dep. Parker, p. 44, ll. 19-22).

On October 4, 2005, the day of the electrical fire killing Mr. Tinsley, Parker went to the factory and MKT asked Parker to check if power was turned on in a certain area (Dep. Parker, p. 51, ll. 18-21). MKT did not specifically state if it would pay Parker for his time, but Parker was concerned with whether he would be paid. (Dep. Parker, p. 52, ll. 6-8; p. 53, ll. 8-9). Even though Parker was not formally hired and was never paid money, Parker completed the tasks on October 4, 2005 hoping "that [he] would get hired." (Dep. Parker, p. 54, ll. 3-7; p. 58, ll. 1-6). Parker hoped that in the end "[MKT] possibly would hire" him. (Dep. Parker, p. 70, ll. 10-14).

In support of its motion for summary judgment and in opposition to Parker's cross-

6

motion for summary judgment on this same issue, Allstate argues that it does not owe coverage or a defense to Parker because all of his actions at the old Thomson plant, including those on October 4, 2005, were activities "engaged in for economic gain," and thus, excluded as a business activity. Even though MKT, Inc. never paid Parker or filled out paperwork for Parker to sign, Parker went to the old Thomson plant to earn a livelihood. Allstate maintains that the Homeowners Policy and case-law is clear that an insured is not entitled to coverage or a defense if his actions have a profit or livelihood motive.

As noted, the Homeowners Policy provides that "[s]ubject to the…limitations of this policy, Allstate will pay damages which an insured person becomes legally obligated to pay because of bodily injury or property damage arising from an occurrence to which this policy applies, and covered by this part of the policy." However, Allstate "[does] not cover bodily injury or property damage arising out of the past or present business activities of an insured person…" The key question is whether an insured's activities constitute a business. The Homeowners Policy defines "Business" as "[a]ny full or part-time activity of any kind engaged in for economic gain…" According to Allstate, this definition is clear and unambiguous, especially when applied the facts in this case.

Prior to any contact with MKT, Parker went to the old Thomson plant twice for pay, to perform odd jobs that were within his expertise as a former Thomson plant maintenance man. Parker never went to the plant unless he was paid during the summer and early fall of 2005.  All of these activities would clearly fall within the definition of business because they were "part-time activities" for which Parker received "economic gain."

Later facts show Parker went to an interview with MKT, where he negotiated wages and

working hours. Approximately the day after the interview, Parker returned to the old Thomson plant at the request of MKT to check electricity in one area with the hope that "[MKT] possibly would hire" him. (Dep. Parker, p. 44, ll. 19-22; p. 51, ll. 18-21; p. 70, ll. 10-14).

Allstate contends that even though MKT never officially paid Parker (Dep. Parker, p. 58, ll. 1-6), Parker's activities with MKT also fall within the exclusion because they were "engaged in for economic gain." The definition of business *does not* state Parker had to be paid, but that there was intent for economic gain.

Parker went to the old Thomson plant approximately once a month from July to October, 2005, only when he was paid or hoped to be paid for odd jobs requiring his expertise as the former maintenance man. The only reason Parker went to the facility during the summer and fall of 2005 was due to his business as a maintenance man. Therefore, Allstate concludes that under the Homeowners Policy, Parker should not be afforded coverage or a defense because Allstate does not cover "bodily injury or property damage arising out of the present business activities of an insured person…."

Parker's actions also would be excluded under the case-law definition of "business pursuits," which states "an insured is engaged in a business pursuit only when he pursues a continued or regular activity for the purpose of earning a livelihood." Frankenmuth Mut. Ins. Co. v. Williams, 690 N.E.2d 675, 680 (Ind. 1997)(quoting Am. Family Ins. Co. v. Bentley, 352 N.E.2d 860, 865 (Ind. Ct. App. 1976)).  Allstate claims that in the present case,  Parker was regularly at the old Thomson plant to earn a livelihood. Parker worked at the plant for Thomson from January 1966 until it shut down on June 15, 2004, then worked there through a temporary agency, and then only returned approximately once a month from July through October, 2005

8

when he would be or hopefully would be paid for odd jobs. Even though Parker was never paid by MKT, he was at the old Thomson plant hoping "[MKT] possibly would hire" him. (Dep. Parker, p. 70, ll. 10-14). Again, Allstate concludes that Parker's livelihood constituted working at the old Thomson plant and therefore, he continually engaged in a business pursuit under Indiana case-law and is not entitled to coverage or a defense.

In response, the defendants argue that Parker's action of going to the plant to draw a diagram in the hope he might be hired, but with no expectation or promise of compensation, was not a business activity as defined by the policy because it was not "engaged in for economic gain."  The defendants contend that any prospective economic gain from possible future employment was too remote and tenuous for Parker's actions to constitute a business activity.

Parker claims that his actions in interacting with MKT on two occasions during the summer of 2005 were not "business" as defined by the Policy because they were not actions for economic gain.  Parker argues that his actions were the actions of a former employee being asked to share his knowledge of the former Thomson facility.  Parker states that he never believed that MKT would offer him employment but, instead, believed that MKT was merely using him to secure access to his knowledge of the former Thomson facility.

However, as Allstate notes in reply, The only inference possible is that Parker was involved in a business activity on October 4, 2005 when he went to the old Thomson factory in the hope of obtaining employment to check if power was turned on in a certain area for MKT employees. (Dep. Parker, p. 51, ll. 18-21; p. 54, ll. 3-7; p. 58, ll. 1-6). The policy at issue defines business as "any full or part-time activity of any kind engaged in for economic gain."  Since business is defined in the policy, outside sources should not be used to define business. If

9

insurance language is clear and unambiguous, it should be given its plain and ordinary meaning. Askren Hub, 721 N.E.2d at 275. An unambiguous policy "…*must* be enforced according to its terms, *even those terms that limit an insurer's liability*." Id., citing Selleck v. Westfield Ins. Co., 617 N.E.2d 968, 970 (Ind. Ct. App. 1993)(emphasis added). Ambiguities do not arise because different parties provide different interpretations of the same policy. Id. A policy is only ambiguous if it is "susceptible to more than one interpretation and reasonably intelligent persons would differ as to its meaning." Id., quoting Commercial Union Ins. v. Moore, 663 N.E 2d 179, 181 (Ind. Ct. App. 1996). The policy at hand clearly defines "business" in the definition section and thus outside sources should not be used to redefine the word in a policy.

With respect to Parker's contention that he suspected MKT had no intention of hiring him, Allstate points out that this argument hinges on MKT's state of mind, the contents of which Parker can only speculate and cannot be within Parker's personal knowledge as required by Fed. R. Evid. 602. In Indiana, plaintiffs may not avoid summary judgment by the presentation of "evidence based merely upon supposition or speculation." *Roberson v. Hicks,* 694 N.E.2d 1161, 1163 (Ind. Ct. App. 1998). "Testimony based on conjecture or speculation is insufficient to support a claim." *Colen,* 654 N.E.2d at 1162. Parker is forced to speculate because he admittedly went to the factory with the "hope" of gaining employment. This material fact is known because it is Parker testifying to his own state of mind, as opposed to MKT's state of mind. The definition of business hinges on what the insured "engaged in for economic gain" (Am. Compl. Ex. A, p. 3); hence, the definition revolves around the insured's state of mind, not the potential employer's state of mind. This court agrees with Allstate that Parker went to the factory "hoping" to be employed and thus his actions were a "part-time activity . . . engaged in

10

for economic gain," and  thus, the policy affords Parker no coverage or a defense under its terms.

Parker argues that he did not work "continuously" as a *lead electrician* at the Thomson facility. Based on the business exclusion and definitions, it does not matter if Parker worked there as a temporary employee, janitor, maintenance man, or lead electrician. The question is whether he was engaged in any "activity…for economic gain."

Due to the nature of business at a closing factory, Parker did work at the old Thomson factory continuously. He worked there from January 1966 through June 15, 2004 under the official Thomson name (Dep. Parker, p. 6, ll. 11-13) and then stayed on as an employee of Wimmer Temporary Service until April 1, 2005 (Dep. Parker, p. 12, ll. 4-7; p. 16, ll. 13-16).

Parker then went to the old Thomson Factory four more times for employment from April until October, 2005: twice for his former supervisor, Matt Queen, (Dep. Parker, p. 23, ll. 12-14) and twice for MKT (Dep. Parker, p. 28, ll. 6-8; p. 30, ll. 18, 24; p. 31, l. 1; p. 51, ll 18-21). This factory was closing down and Parker worked continuously throughout this process when he was called and his services were needed.

Parker also argues that he did not have a sufficient profit motive.  However, the business exclusion in the policy at issue does not state how much profit Parker had to make, but that there was the intent for "economic gain." Clearly,  Parker had a profit motive because he went to the factory "hoping" to be hired, and was worried he would not be paid. (Dep. Parker, p. 53, ll. 8-9). The only inference available is that he went there to further his livelihood.

Accordingly, the court will grant Allstate's motion for summary judgment and deny Parker's motion for summary judgment.

## Conclusion

11

Based on the foregoing, Allstate's motion for summary judgment is hereby GRANTED.

Further, Parker's motion for summary judgment is hereby DENIED.

This case is hereby TERMINATED.


Entered: February 26, 2008.

                                              s/ William C. Lee
                                              William C. Lee, Judge
                                              United States District Court